IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM CRAMER, | : Civil No. 1:23-CV-01988 |
| | : |
| Plaintiff, | : |
| | : |
| v. | : (Chief Magistrate Judge Bloom) |
| | : |
| SCOTT PRINCE, et al., | : |
| | : |
| Defendants. | : |

## MEMORANDUM OPINION

### I.  Introduction

Before the Court is a motion for a temporary restraining order and preliminary injunction (Doc. 7), filed by Plaintiff William Cramer ("Plaintiff"), as well as a motion to dismiss Plaintiff's complaint or, in the alternative, motion for summary judgment (Doc. 22), filed by Defendants Scott Prince and Mark Abel (collectively, "Defendants").  For the reasons set forth below, the Court will deny Plaintiff's motion for a temporary restraining order and preliminary injunction (Doc. 7), and the Court will grant Defendants' motion to dismiss or, in the alternative, motion for

summary judgment, but only to the extent that it seeks dismissal of Plaintiff's medical negligence claim (Doc. 22).[1]

## II.  Background

### A. Procedural Background

Plaintiff is a state prisoner in the custody of the Pennsylvania Department of Corrections, and he is currently incarcerated at State Correctional Institution Dallas ("SCI Dallas") in Dallas, Pennsylvania. (Doc. 1.) On December 4, 2023, he commenced the above-captioned action by filing a *pro se* complaint pursuant to 42 U.S.C. § 1983 ("Section 1983"), asserting a violation of his Eighth Amendment rights under the United States Constitution, as well as medical negligence under Pennsylvania state law. (*Id.*) He alleges that the Defendants, two medical personnel at SCI Dallas (*id.* at 3–4), were deliberately indifferent to, and provided inadequate medical care for, his injured foot (*id.* at 4–9).

In addition to his complaint, Plaintiff has also filed a motion for a temporary restraining order and preliminary injunction, along with a supporting brief.  (Docs. 7, 8.) In his motion, Plaintiff reiterates the

---

[1] As discussed more fully below, Defendants have withdrawn their summary-judgment portion of their motion.  (Doc. 33.)

allegations in his complaint and requests that the Court grant him such preliminary relief to ensure that he timely receives adequate medical care and is not irreparably harmed by the failure to provide him with such care. (*Id.*)

After Plaintiff filed his motion for a temporary restraining order and preliminary injunction, counsel entered an appearance on behalf of Defendants and filed their waiver of the service of summons in this action. (Docs. 15 through 17.)[2] As reflected by the Court's docket, Defendants did not initially file a response to Plaintiff's motion or seek an extension of time in which to do so. Because, however, the Court found that a response to Plaintiff's motion would be beneficial to the disposition thereof, the Court directed Defendants to file a response. (Doc. 25.) Defendants have since filed a brief in opposition to Plaintiff's motion (Doc. 29), to Plaintiff has filed a reply brief (Doc. 34).

As further reflected by the Court's docket, Defendants have also filed a notice of their intent to seek dismissal of Plaintiff's medical negligence claim based upon his failure to produce a certificate of merit

---

[2] After counsel entered an appearance on behalf of Defendants, the parties consented to proceed before a United States Magistrate Judge. (Docs. 18, 20.)

pursuant to the Pennsylvania Rules of Civil Procedure, *see* Pa. R.C.P. 1042.3 (Doc. 21), as well as a motion to dismiss Plaintiff's complaint or, in the alternative, a motion for summary judgment, along with a supporting brief (Docs. 22, 23).  In their motion, Defendants raise two arguments: (1) Plaintiff failed to exhaust administrative remedies, as required by the Prison Litigation Reform Act, *see* 42 U.S.C. § 1997e(a); and (2) Plaintiff failed—as stated in their aforementioned notice—to produce a certificate of merit, as required by the Pennsylvania Rules of Civil Procedure, *see* Pa. R.C.P. 1042.3.  (*Id.*)

Although Defendants submitted various exhibits in support of their administrative exhaustion argument (Doc. 22-2), they did not file a statement of material facts in support of their alternative request for summary judgment. Thus, because exhaustion was in dispute, and because consideration of that issue would compel the Court to consider matters outside the pleadings, the Court directed Defendants to supplement their motion and supporting brief on the issue of administrative exhaustion by filing a statement of material facts in accordance with Local Rule 56.1 of the Court's Local Rules, as well as any other materials relevant to the issue.  (Doc. 25.)

4

In the interim, Plaintiff filed a brief in opposition to Defendants' motion, along with numerous exhibits. (Docs. 26; 26-1 through 26-8.) Defendants subsequently filed a reply brief, explaining that they "withdraw their failure to exhaust administrative remedies argument for purposes of" their pending motion—but that they preserve the defense to raise it at a later time upon a more fully developed record—and that they still maintain their arguments in their pending motion with respect to Plaintiff's medical negligence claim. (Doc. 33.) Thus, the parties' pending motions (Docs. 7, 22), which have been briefed by the parties, are ripe for the Court's resolution.

B. <u>Factual Background</u>

The factual background in this matter is derived from the allegations in Plaintiff's complaint. Those allegations are as follows. On April 26, 2023, Plaintiff suffered a "severe physical trauma to his right foot." (Doc. 1 at 4.) Approximately one hour later, Plaintiff was evaluated at his "unit triage" by Defendant Abel, who informed Plaintiff that his foot appeared to be broken (*id.*) and that his "foot needed to be wrapped and placed in a boot, but that [Defendant Abel] could not provide either to [Plaintiff] because he believed Plaintiff to be a very dangerous

prisoner" (*id.* at 5).  Defendant Abel then recommended that Plaintiff be taken back to his cell, which is "non-handicapped" and located on the "top-tier[.]"  (*Id.*)  In addition, because Plaintiff was not provided with "any medical devices or bandages[,]" he "fell on numerous occasions[,] injuring his foot further." (*Id.*)

The following day, on April 27, 2023, Plaintiff received an x-ray for his foot, and an orthopedic consultation was "submitted." (*Id.*)  Shortly thereafter, Plaintiff "learned that his injury was an off-set fracture." (*Id.* at 6.)  Approximately two (2) weeks later, Plaintiff received a second x-ray.  (*Id.*)  Following his second x-ray, Defendant Prince informed him that "the orthopedic wanted a consultation[;]" however, Defendant Prince stated that, "due to [Plaintiff's] history[,]" the consultation "would not be feasible." (*Id.*)

The following month, on May 12, 2023, Plaintiff was seen by Defendant Abel, who confirmed that "the orthopedic wanted a consultation with Plaintiff[,]" but that, because Defendant Abel and Defendant Prince believed Plaintiff "not to be an ordinary inmate[,]" they determined that the consultation would not "be feasible[,]" and, thus,

Plaintiff "would not be transported to the outside hospital" for further treatment. (*Id.*)

Plaintiff contends that, "[o]n information and belief, [his] institution initiated a Plan of Action . . . that the Defendant [sic] were aware of that sets forth the procedures in transporting him to the outside hospital for medical treatment." (*Id.* at 7.) Plaintiff also contends that he suffers from "severe pain and impaired mobility in his right foot." (*Id.*)

In connection with these allegations, Plaintiff's complaint sets forth two claims against Defendants: (1) an Eighth Amendment claim for deliberate indifference to his serious medical needs asserted under Section 1983; and (2) a medical negligence claim asserted under Pennsylvania law. (*Id.* at 7–9.) With respect to his Eighth Amendment claim, Plaintiff alleges that Defendants were aware of his serious medical need concerning his fractured foot, but that they were deliberately indifferent to such need "by persisting [on an] ineffective course of treatment of health care services[,]" which "caused his foot injury to deteriorate and caused [him] unnecessary pain and suffering[.]" (*Id.* at 8.) With respect to his medical negligence claim, Plaintiff alleges that Defendants failed to provide him with "adequate medical treatment for

his broken foot," which "constitutes the torts of negligence and malpractice under the law of Pennsylvania." (*Id.* at 9.) In his request for relief, Plaintiff seeks declaratory and injunctive relief, as well as compensatory and punitive damages and any other relief that the Court deems just and proper. (*Id.* at 10–11.)

In addition to his complaint, and as mentioned *supra*, Plaintiff has also filed a motion for a temporary restraining order and a preliminary injunction, along with a supporting brief. (Docs. 7, 8.) In his supporting brief, Plaintiff reiterates the crux of his complaint—*i.e.*, that he severely injured his foot and that Defendants have not provided him with a consultation even though the orthopedic has requested such a consultation to assess him and to treat his injury. (*Id.*) In connection with the allegations in his complaint, Plaintiff requests that the Court issue a temporary restraining order and a preliminary injunction to ensure that he receives proper medical care. (*Id.*)

III.    <u>Legal Standard – Motion to Dismiss</u>[3]

Rule 12(b)(6) permits the Court to dismiss a complaint if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Under federal pleading standards, a complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

In determining whether a complaint states a claim for relief under this pleading standard, a court must accept the factual allegations in the complaint as true, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and accept "all reasonable inferences that can be drawn from them after construing them in the light most favorable to the non-movant." *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994). However, a court is not required to accept legal conclusions or "a formulaic recitation of the elements of a cause of action."

---

[3] Because Defendants have withdrawn their administrative exhaustion argument (Doc. 33), the remaining arguments in their pending motion concern Plaintiff's medical negligence claim and relate only to the motion-to-dismiss portion of their motion, not the summary-judgment portion. *See, e.g.*, (Doc. 23 at 1 n.1 (explaining that their pending motion was brought in the alternative for summary judgment because Defendants were asserting a failure-to-exhaust defense)).

*Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare

recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice").

> As the Third Circuit Court of Appeals has aptly summarized:

> [A]fter *Iqbal*, when presented with a motion to dismiss for
> failure to state a claim, district courts should conduct a two-
> part analysis. First, the factual and legal elements of a claim
> should be separated. The District Court must accept all of the
> complaint's well-pleaded facts as true, but may disregard any
> legal conclusions. *Id.* Second, a District Court must then
> determine whether the facts alleged in the complaint are
> sufficient to show that the plaintiff has a "plausible claim for
> relief." *Id.* at 1950. In other words, a complaint must do more
> than allege the plaintiff's entitlement to relief. A complaint
> has to "show" such an entitlement with its facts. *See Phillips*,
> 515 F.3d at 234–35. As the Supreme Court instructed in *Iqbal*,
> "[w]here the well-pleaded facts do not permit the court to infer
> more than the mere possibility of misconduct, the complaint
> has alleged—but it has not 'show[n]'—'that the pleader is
> entitled to relief.' " *Iqbal*, 129 S.Ct. at 1949. This "plausibility"
> determination will be "a context-specific task that requires
> the reviewing court to draw on its judicial experience and
> common sense." *Id.*

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009).

Generally, when considering a motion to dismiss, a court relies on

the complaint and its attached exhibits, as well as matters of public

record. *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007). A court

can also consider "undisputedly authentic document[s] that a defendant

attached as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Additionally, if the complaint relies on the contents of a document not physically attached to the complaint but whose authenticity is not in dispute, the court may consider such document in its determination. *See Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002). However, the court may not rely on any other part of the record when deciding a motion to dismiss. *Jordan*, 20 F.3d at 1261.

## IV.   Discussion

### A. Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction

The standard of review for analyzing a motion for a temporary restraining order is the same as the standard of review for analyzing a motion for a preliminary injunction. *See Hilb Grp. of Maryland, LLC v. Smith*, 23-CV-01978, 2024 WL 2216851, at *3 n.31 (M.D. Pa. May 15, 2024); *Freedland v. Mattingly*, No. 20-CV-00081, 2020 WL 1984172, at *1 (M.D. Pa. Apr. 27, 2020) (citations omitted).  As a result, the Court will refer to Plaintiff's request for relief simply as a request for preliminary injunctive relief.

The United States Court of Appeals for the Third Circuit has explained that "[p]reliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citation and internal quotation marks omitted); *Greater Philadelphia Chamber of Com. v. City of Philadelphia*, 949 F.3d 116, 133 (3d Cir. 2020) ("*Greater Philadelphia*") (recognizing this same principle (footnote and citation)). Indeed, a court should not issue such an extraordinary remedy "'unless the movant, by a clear showing, carries the burden of persuasion.'" *Holland v. Rosen*, 895 F.3d 272, 285 (3d Cir. 2018) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).

Thus, to determine whether a preliminary injunction should issue, a court must consider whether the movant has demonstrated the following four (4) factors: "'(1) whether the movant has a reasonable probability of success on the merits; (2) whether irreparable harm would result if the relief sought is not granted; (3) whether the relief would result in greater harm to the non-moving party[;] and (4) whether the relief is in the public interest.'" *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 102–03 (3d Cir. 2022) (quoting

*Swartzwelder v. McNeilly*, 297 F.3d 228, 234 (3d Cir. 2002)); *Greater Philadelphia*, 949 F.3d at 133 (setting forth these same factors (footnote and citation omitted)).

"Generally, the moving party must establish the first two factors and only if these gateway factors are established does the district court consider the remaining two factors." *Id.* (footnote, citation, and internal quotation marks omitted); *Holland*, 895 F.3d at 286 (explaining that "[t]he first two factors are prerequisites for a movant to prevail" (citations omitted)). The first factor requires the movant to "'demonstrate that [he] can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not)." *Id.* (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017)). The second factor requires the movant to demonstrate that "'that [he] is more likely than not to suffer irreparable harm in the absence of preliminary relief.'" *Id.* (quoting *Reilly*, 858 F.3d at 179)). If those two gateway factors are met, "[t]he court then determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Greater Philadelphia*, 949 F.3d at 133 (footnote, citation, and internal quotation marks omitted).

Here, Plaintiff's complaint alleges that, after he underwent x-rays of his foot, an outside orthopedic specialist wanted to see Plaintiff for a consultation, but that Defendants informed him this could not happen because he is "a very dangerous" inmate within the DOC.  (Doc. 1 at 5–6.)  Turning to his instant motion, Plaintiff similarly asserts, as follows:

> As stated in Plaintiff's verified complaint submitted with this motion, [Plaintiff] severely injured his foot.  The orthopedic who was consulted requested a consultation. [Defendants] did not provide Plaintiff with a consultation with the orthopedic in order to assess and treat his condition. [Plaintiff] is experiencing continued pain, stiffness, and limited motion in his foot and cannot walk properly.

(Doc. 8 at 2.)  Accordingly, Plaintiff's instant motion, when taken together with the allegations of his complaint, requests that the Court direct Defendants to send him for an outside orthopedic consultation.  *See* (Docs. 1, 7).

In response to Plaintiff's request, Defendants argue that Plaintiff *has* been evaluated by an orthopedic specialist via telemedicine and that, therefore, his request for preliminary injunctive relief should be denied as moot.  (Doc. 29.)  In support, Defendants have submitted Plaintiff's medical records, spanning a period from April 2023 to February 2024. (Doc. 29-1.)

14

The Court, having reviewed the parties' arguments, the medical records submitted by Defendants, and relevant authority, concludes that Plaintiff has failed to establish at least one of the "gateway factors" necessary for the issuance of a preliminary injunction—that is, Plaintiff has failed to carry the burden of persuasion that he is more likely than not to suffer irreparable harm in the absence of preliminary injunctive relief.  Indeed, despite Plaintiff's assertions that he has not been provided with adequate medical care for his foot (*i.e.*, he was denied a consultation with an outside orthopedic specialist) his medical records reveal otherwise.

In summary, Plaintiff's medical records reveal, as follows.  On April 26, 2023, the medical staff at SCI Dallas timely responded to his right foot injury, which resulted from him kicking a door.  (Doc. 29-1 at 65–79.)  Plaintiff was given an ankle sleeve for compression and "[a]nalgesia as needed" (*id.* at 65–66, 69, 86–87), and he was directed to rest and encouraged to utilize "[leg] [e]levation" (*id.* at 78).  The following day, on April 27, 2023, Plaintiff underwent an x-ray of his right foot.  (*Id.* at 83–84.)  The x-ray images revealed a first metatarsal fracture.  (*Id.*)

15

As a result, a consultation was arranged with an outside orthopedic specialist—namely, Michael Raklewicz ("Dr. Raklewicz"). (*Id.* at 85.) However, the consultation was conducted via teleconferencing because of Plaintiff's history of violence within the DOC. (*Id.*); *see also* (*id.* at 59 (containing Defendant Prince's report, wherein he explains that: the Superintendent at SCI Dallas had requested that he inquire as to whether the orthopedic specialist would be willing to see Plaintiff "via telemed due to his high risk[;]" and Defendant Prince, in turn, spoke with Dr. Raklewicz, who explained that he did not need to physically evaluate Plaintiff because he could review Plaintiff's x-ray films); *id.* at 85 (containing Dr. Raklewicz's medical report, wherein he explains that he was also able to ask Defendant Prince questions about Plaintiff's physical condition during the teleconference)).

The plan was for Plaintiff to be "nonweightbearing Ace bandage[;] [h]e cannot use a cam walker because of the metal in the cam walker and the plastic and braces are too dangerous." (*Id.* at 85); *see also* (*id.* at 59 (explaining, *inter alia*, that the recommendation was for Plaintiff to be "boot or ACE, NWB . . .")). Additionally, the plan was for Plaintiff to be x-rayed again in two weeks, at which time Dr. Raklewicz would review

16

the x-ray films. (*Id.*); *see also* (*id.* at 56 (explaining that Plaintiff was provided information related to his x-ray, as well as Dr. Raklewicz's recommendations, and that Plaintiff was encouraged to stay off his right foot as much as possible)). In addition, it was also noted, at this time, that Plaintiff's fracture would not require surgical intervention. (*Id.* at 56, 59.)

Plaintiff subsequently underwent a repeat x-ray of his right foot on May 11, 2023, which revealed no substantial change in alignment, and that Plaintiff was in the process of healing. (*Id.* at 80–81.) On that same date, Dr. Raklewicz entered a consultative note, explaining that the two-week x-ray showed no further displacement of Plaintiff's first metatarsal fracture, and no widening of the metatarsals in the area. (*Id.* at 82.) The plan was for Plaintiff to continue to be "nonweightbearing on crutches[,]" and to be x-rayed again in two weeks. (*Id.*)

The medical records reflect that Plaintiff was seen the following day, that he was provided information about his foot x-ray, and that he was "instructed [that] a consult was place [sic] at which time it will be a telemedicine conference to prevent him from going out." (*Id.* at 44.) Two days later, on May 14, 2024, Plaintiff was seen again because he had

requested information concerning his foot. (*Id.* at 42–43.) It was noted that the "situation ha[d] been discussed" with Plaintiff "before in the past." (*Id.* at 42.) The plan was discussed "again" with Plaintiff, and "reassurance [was] given." (*Id.*)

Plaintiff was also seen on May 15 and 17, 2023, regarding his foot. (*Id.* at 33–41.) During these visits, Plaintiff requested, and was provided, information regarding the treatment plan for his foot. (*Id.*; *id.* at 34 (noting that the plan was discussed with Plaintiff "again").) Additionally, on May 18, 2023, it was noted that Dr. Raklewicz reviewed Plaintiff's follow-up x-rays and was satisfied with the healing of Plaintiff's foot thus far. (*Id.* at 30–31.) It was also noted that Dr. Raklewciz's plan was for Plaintiff to continue to be non-weightbearing and to repeat the x-ray two weeks "from last one." (*Id.* at 30.) At this time, Plaintiff was also informed that, per the Superintendent's request, his appointments were being done remotely and that the specialist did not need to see him personally; he needed only to review his x-rays. (*Id.*) "If continued healing seen, no further follow-up needed." (*Id.* at 31.)

Plaintiff underwent an x-ray on May 25, 2023, which revealed that there was no substantial change in alignment, and that he was in the

process of healing. (*Id.* at 28–29.) Plaintiff was subsequently seen on June 6, 2023, and on June 16, 2023, regarding his right foot. (*Id.* at 24–27); *see also* (*id.* at 24 (providing that Plaintiff was informed that his May 25, 2023 x-ray showed that his foot fracture was healing); *id.* at 26 (providing that the treatment plan was explained to Plaintiff, and that he was "again" informed that his orthopedic consultations are being done "remotely")).

Plaintiff was also subsequently seen on August 16, 2023, complaining of right foot pain. (*Id.* at 18–19.) Plaintiff was assessed through his cell door "at security discretion[.]" (*Id.* at 18.) It was noted, *inter alia*, that Plaintiff was walking in his cell without difficulty and that he had no antalgic gait. (*Id.*) Plaintiff was prescribed Naproxen for his pain. (*Id.* at 18–19.)

Thereafter, on November 15, 2023, Plaintiff was evaluated because he was experiencing pain after admitting he had kicked a door. (*Id.* at 12–13.) It was noted that Plaintiff had no edema in his right lower leg or foot and that he was able to move his toes upon request. (*Id.*) It was also noted that Plaintiff refused to attempt any range of motion exercises to his right foot and ankle because it hurt "too much." (*Id.* at 12.) Plaintiff

was prescribed Motrin, and he was encouraged to return to sick call as needed or if his symptoms worsened. (*Id.*)  Additionally, an x-ray was ordered for Plaintiff since he had kicked the door with his right foot, which—as set forth above—he had previously fractured. (*Id.* at 11.)

Plaintiff underwent an x-ray of his right foot the following day on November 16, 2023. (*Id.* at 9–10.)  The x-ray image revealed no evidence of an acute fracture, and no evidence of soft tissue swelling. (*Id.*); *see also* (*id.* at 7–8 (providing that: his x-ray was negative for a fracture; and his old fracture had healed)).  Plaintiff was informed of his x-ray results. (*Id.* at 7–8.)

In January 2024, it was noted that Plaintiff admitted to kicking a door. (*Id.* at 5.)  There was, however, no indication for a need to conduct an additional repeat x-ray, and Plaintiff was instructed to return to sick call as necessary or for any increased symptoms concerning his foot. (*Id.* at 5–6); *see also* (*id.* at 6 (explaining that, "[d]ue to past trauma[,] this may be the sequalae of prior foot fracture . . . ")).

The following month, on February 5, 2024, Plaintiff was seen for his foot. (*Id.* at 3–4.)  It was noted that Plaintiff was standing and that he did not exhibit any apparent distress. (*Id.*)  In addition, Plaintiff denied

20

having sustained any recent injuries.  (*Id.*)  Plaintiff received Tylenol for his complaints of pain.  (*Id.*)

Finally, Plaintiff's medical records show that, on February 12, 2024, he was seen for the following complaint: "I am still having problems with my foot.  Something is terribly wrong.  All you are doing is giving me a hard time.   I am being deprived adequate and meaningful medical treatment." (*Id.* at 1.)  It was noted that Plaintiff had been advised that he would likely have "chronic pain due to past fracture from trauma[,]" and that his foot "may not be [the] same since injury." (*Id.* at 2.)  Plaintiff was also encouraged to sick call as needed or if his symptoms worsened. (*Id.* at 1–2.)

Based upon this record, which Plaintiff has not meaningfully disputed,[4] the Court is unable to discern any irreparable harm to Plaintiff

---

[4] Plaintiff does not squarely address Defendants' contention that he received a consultation with the orthopedic specialist via telemedicine. *See* (Doc. 34).  Instead, Plaintiff focuses on perceived "contradictions" in his medical record.  *See* (*id.* at 2 (asserting that one medical provider at SCI Dallas (*i.e.*, Julie Disabatino, a registered nurse) stated that Plaintiff was able to move his toes freely, while Defendant Abel stated, on the same day, that Plaintiff was unable to move his toes)).  Additionally, Plaintiff focuses on whether his medical treatment plan was correctly followed at SCI Dallas. *See* (*id.* at 2 (acknowledging that he received an ankle compression sleeve, but arguing that he was not provided crutches)).  Such allegations and argument simply do not demonstrate

which cannot be redressed by a legal or equitable remedy following a trial in this matter—should the case progress that far. *See Siemens USA Holdings Inc v. Geisenberger*, 17 F.4th 393, 407–08 (3d Cir. 2021) (stating that "[w]hen it comes to the second factor, irreparable harm, '[t]he law . . . is clear in this Circuit: [i]n order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial[,]'" and "'[t]he preliminary injunction must be the only way of protecting the plaintiff from harm'" (quoting *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992))).

Accordingly, because Plaintiff has failed to establish this gateway factor of irreparable harm, the Court need not examine the remaining factors necessary for the issuance of a preliminary injunction. *See Greater Philadelphia*, 949 F.3d at 133 (holding that, only if the movant establishes the two gateway factors—*i.e.*, a likelihood of success on the merits and the existence of irreparable harm—should "the district court consider the two remaining factors" (footnote and citation omitted));

---

that Plaintiff is *likely* to suffer any irreparable harm if preliminary injunctive is not granted by this Court.

*Holland*, 895 F.3d at 286 (explaining that "[t]he first two factors are prerequisites for a movant to prevail" (citations omitted)).   Further, because Plaintiff has failed to establish this gateway factor of irreparable harm, the Court concludes that he has not met his heavy burden of demonstrating his entitlement to preliminary injunctive relief.   The Court will, therefore, deny his instant motion.

### B. <u>Defendants' Motion to Dismiss Plaintiff's Medical Negligence Claim</u>

For a plaintiff to prevail on a medical negligence claim under Pennsylvania state law, "the plaintiff must prove that the defendant's treatment fell below the appropriate standard of care." *Brady v. Urbas*, 111 A.3d 1155, 1161 (Pa. 2015) (citations omitted); *Toogood v. Rogal*, 824 A.2d 1140, 1145 (Pa. 2003) (stating that "medical malpractice can be broadly defined as the unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient . . . ").

"[W]hen a plaintiff's medical malpractice claim sounds in negligence, the elements of the plaintiff's case are the same as those in ordinary negligence actions." *Id.*; *accord Ditch v. Waynesboro Hosp.*, 917 A.2d 317, 322 (Pa. Super. Ct. 2007), *aff'd*, 17 A.3d 310 (Pa. 2011), (providing that "the basic elements of medical malpractice and ordinary

23

negligence are the same . . . " (citation omitted)).  Thus, to establish a prima facie case for ordinary and medical negligence claims under Pennsylvania law, a plaintiff must establish: (1) a duty of care owed by the physician to the patient; (2) a breach of that duty; (3) the breach of that duty was the proximate cause of the harm suffered by the patient; and (4) the damages suffered were a direct result of that harm.  *See Mitchell v. Shikora*, 209 A.3d 307, 314 (Pa. 2019) (citing *Hightower-Warren v. Silk*, 698 A.2d 52, 54 (Pa. 1997)).  Put differently, "to prevail on a claim of medical negligence, the plaintiff must prove, *inter alia*, that the defendant's treatment fell below the appropriate standard of care—that is, varied from accepted medical practice." *See Mitchell*, 209 A.3d at 314–15.

As "[w]ith all but the most self-evident medical malpractice actions[,] there is also the added requirement that the plaintiff must provide a medical expert who will testify as to the elements of duty, breach, and causation." *Quinby v. Plumsteadville Fam. Prac., Inc.,* 907 A.2d 1061, 1070–71 (Pa. 2006) (citation omitted); *Mitchell*, 209 A.3d at 315 (providing that a "plaintiff in a medical negligence matter is required to present an expert witness who will testify, to a reasonable degree of

medical certainty, regarding the standard of care (duty); that the acts of the physician deviated from the standard or care (breach); and that such deviation was the proximate cause of the harm suffered" (citation omitted)).

Indeed, as explained by the Pennsylvania Supreme Court, "[e]xpert testimony in support of the plaintiff's claim is an indispensable requirement in establishing a plaintiff's right of action, as the treatment and injury typically involved are such that the common knowledge or experience of a layperson is insufficient to form the basis for passing judgment." *Mitchell*, 209 A.3d at 315 (citation omitted); *Toogood*, 824 A.2d at 1145 (explaining that, "[b]ecause the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons a medical malpractice plaintiff must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury" (citation omitted)).

This requirement is embodied in Rule 1042.3 of the Pennsylvania Rules of Civil Procedure, which provides that, "[i]n any action based upon an allegation that a licensed professional deviated from an acceptable professional standard, the attorney for the plaintiff, or the plaintiff if not

represented, shall file with the complaint or within sixty days after the filing of the complaint, a certificate of merit signed by the attorney or party[.]"  Pa. R. Civ. P. 1042.3(a). This certificate of merit shall either state that: (1) "an appropriate licensed professional has supplied a written statement that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm[;]" (2) "the claim that the defendant deviated from an acceptable professional standard is based solely on allegations that other licensed professionals for whom this defendant is responsible deviated from an acceptable professional standard[;]" or (3) "expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim." Pa. R. Civ. P. 1042.3(a)(1), (2), (3).

Finally, the United States Court of Appeals for the Third Circuit has explained that Rule 1042.3 is substantive state law under *Erie R.R. v. Thompkins*, 304 U.S. 64 (1983) and must, therefore, be applied as such by federal courts. *See Liggon-Redding*, 659 F.3d at 262–65; *Schmigel v. Uchal*, 800 F.3d 113, 115 (3d Cir. 2015) (recognizing the same). Neither

ignorance of these certificate- of-merit requirements, nor a party's *pro se* status can serve as a reasonable basis for failure to comply. *See Parkway Corp v. Edelstein*, 861 A.2d 264, 267–69 (Pa. Super. Ct. 2004) (concluding that ignorance was not a reasonable justification for failure to comply with Rule 1042.3); *see also Hoover v. Davila*, 862 A.2d 591, 595 (Pa. Super. Ct. 2003) (rejecting *pro se* party's claims that "he was unaware of the new rule of civil procedure requiring certificates of merit or that he did not understand the rule" as "just cause" for untimely filing a certificate of merit).

Accordingly, and in sum, the general rule in medical negligence actions brought under Pennsylvania state law is that a plaintiff *must* present medical expert testimony to establish that the care and treatment he received by the defendant fell short of the required standard of care and that such breach proximately caused his injury. *See Toodgood*, 824 A.2d at 1145. The only exception to that general rule "applies where the matter is so simple or the lack of skill or care so obvious as to be within the range of experience and comprehension of even non-professional persons, . . . also conceptualized as the doctrine of *res ipsa loquitur*." *Id.* (internal citation and quotation marks omitted);

*see also Brady v. Urbas*, 111 A.3d 1155, 1162 n.6 (Pa. 2015) (noting that, "[e]xcept in the most obvious cases of negligence (such as where a gauze pad is left inside a patient's body), expert testimony is necessary to establish the standard of care").

Even where this exception applies, however, it "must be carefully limited[,]" and "three conditions must be met before the doctrine of *res ipsa loquitur* may be invoked"—that is: (1) "either a lay person is able to determine as a matter of common knowledge, or an expert testifies, that the result which has occurred does not ordinarily occur in the absence of negligence;" (2) the agent or instrumentality causing the harm was within the exclusive control of the defendant;" and (3) "the evidence offered is sufficient to remove the causation question from the realm of conjecture, but not so substantial that it provides a full and complete explanation of the event." *See id.* at 1149–50.

Here, the docket reflects that Plaintiff has not produced a certificate of merit, as required by Pennsylvania law. In light of Plaintiff's failure to do so, Defendants have explained that, on May 10, 2024, they served upon Plaintiff, and filed on the docket, a notice of their intent to seek dismissal of Plaintiff's medical negligence claim. (Doc. 21.)  Defendants

argue that, despite such notice, Plaintiff still has failed to file a certificate of merit. *See* (Docs. 23 at 12; 33 at 2.) As such, Defendants contend that Plaintiff's medical negligence claim should be dismissed. *See* (*id.*). The Court agrees.

Although Plaintiff sought, and was granted, an extension of time to file a certificate of merit (Doc. 25 (granting Plaintiff until July 29, 2024, to file a certificate of merit)), that deadline has passed, and the docket reveals that Plaintiff has not taken any affirmative steps to: comply with Rule 1042.3; seek an additional extension of time to comply with that Rule;[5] or show a reasonable explanation for his failure to do so. As discussed above, however, Pennsylvania law generally requires expert testimony for Plaintiff to establish his claim of medical negligence against Defendants.

Moreover, the Court cannot conclude that the limited exception of *res ipsa loquitur* applies here. Indeed, the issues in this case (*i.e.*, addressing the signs and symptoms of a foot injury, ascertaining

---

[5] Notably, the Court's June 13, 2024 Order provided, in pertinent part, as follows: "should [Plaintiff] desire to file supplemental briefing on this certificate-of-merit issue after the July 29, 2024 deadline expires, he need only file a proper motion with the Court." (Doc. 30 n.1.)

appropriate medication for such injury and determining whether any additional forms of treatment, such as x-rays, compression sleeves, and/or crutches, are necessary) encompass matters within the common knowledge and experience of laypersons.  Stated differently, these issues are not so simple, and the lack of medical skill or care is not so obvious, that they cannot be considered issues within the range of the comprehension of non-medical individuals.  As such, Plaintiff was required to file a certificate of merit, but has not done so.

Accordingly, the Court concludes that Plaintiff falls well short of complying with Pennsylvania Rule 1042.3.  The Court will, therefore, grant Defendants' instant motion on this basis, and the Court will dismiss, without prejudice, Plaintiff's medical negligence claim against Defendants. *See Morrison v. United States*, No. 20-CV-01571, 2021 WL 4192086, at *7 (M.D. Pa. Sept. 15, 2021) (explaining that "[t]he usual consequence for failing to file a certificate of merit that complies with Rule 1042.3 is dismissal of the claim without prejudice" (citing *Booker v. United States*, 366 F. App'x 425, 427 (3d Cir. 2010) (nonprecedential))); *see also Brown v. Glover*, 22-CV-01154, 2023 WL 3997975, at *4 (M.D. Pa. June 14, 2023) (explaining that, to the extent the prisoner-plaintiff

alleged a state law claim of medical negligence, his claim was subject to dismissal because the plaintiff had neither produced a certificate of merit nor asserted that a certificate of merit was not required for his claim); *Folk v. Bureau of Prisons*, 18-CV-2252, 2021 WL 922063, at *4 (M.D. Pa. Mar. 10, 2021) (granting the medical defendant's motion to dismiss the prisoner-plaintiff's professional negligence claim because the plaintiff "did not file the requisite certificate of merit, did not request an extension of time in which to do so, and failed to show a reasonable explanation or legitimate excuse for failure to timely file a certificate of merit").[6]

## V.   Conclusion

For the foregoing reasons, the Court will deny Plaintiff's motion for a temporary restraining order and preliminary injunction (Doc. 7), and the Court will grant Defendants' motion to dismiss or, in the alternative, motion for summary judgment, but only to the extent that it seeks dismissal of Plaintiff's medical negligence claim (Doc. 22).

---

[6] As discussed above, the Court need not reach Defendants' summary-judgment portion of their motion because they have withdrawn their administrative exhaustion argument.  (Doc. 33.)

An appropriate Order follows.


_s/ Daryl F. Bloom_
Daryl F. Bloom
Chief United States Magistrate Judge